**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ANTHONY N. CALABRESE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Case No. 11 C 1795 |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

Before the Court is pro se Petitioner Anthony Calabrese's motion to vacate, set aside, or

correct his sentence pursuant to 28 U.S.C. § 2255. For the following reasons, the Court denies

Calabrese's Section 2255 motion. Further, the Court declines to certify any issues for appeal

pursuant to 28 U.S.C. § 2253(c)(2).

**FACTUAL BACKGROUND**[1]

On September 14, 2006, a grand jury returned a second superseding indictment charging

Calabrese with three counts of robbery in violation of 18 U.S.C. § 1951 and three counts of

brandishing a firearm during and in relation to the commission of those robberies in violation of

18 U.S.C. § 924(c). Calabrese was charged with participating in the 2001 armed robberies of

three retail establishments in the Chicago area: (1) the armed robbery of the Leather Connection

leather goods store in Morton Grove, Illinois on April 13, 2001; (2) the armed robbery of the

---

[1] In its response brief, the government failed to provide a factual background of the trial evidence. Further, outside of the standard of review section in the response brief, the government failed to cite any controlling legal authority except for two boilerplate citations to *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), one of which was in a footnote.

Metamorphous tattoo parlor in Lockport, Illinois on July 24, 2001; and (3) the armed robbery of

Morris' Meat Packing, a butcher shop located in Maywood, Illinois on September 17, 2001.

Calabrese's jury trial began on February 4, 2008 and concluded on February 8, 2008.

## I.    Trial Evidence

### A.    Leather Connection Robbery

At trial, the government presented evidence that Calabrese organized, directed, and

participated in the robbery of the Leather Connection.  Specifically, Calabrese, Robert Cooper,

Sean Smith, Walter Polino, and Marcus Baker gathered at Calabrese's vehicle detailing business,

"Tony C's First Impressions Auto Detail" in Alsip, Illinois on the morning of the Leather

Connection robbery – April 13, 2001.  (R. 310-314, Trial Tr., at 277, 280, 352, 406, 454.)  After

a brief meeting, the group drove north to Morton Grove, Illinois in Polino's car and a rented van.

(*Id.* at 352, 362, 407.)  Calabrese, Cooper, and Smith traveled in the rented van and Polino and

Baker followed in Polino's car.  (*Id.* at 281, 353, 409-10, 457.)  While on the way to the leather

store, Calabrese outlined the robbery plan by telling Cooper and Smith that they would enter the

store first.  (*Id.* at 287, 482.)  Calabrese then handed Cooper a gun to use during the robbery.  (*Id.*

at 282, 457.)

On their way to the Leather Connection, Calabrese talked to his source on the telephone

and garnered information about the store.  (*Id.* at 283, 457.)  The individual with whom

Calabrese was speaking did not want Calabrese to pursue the robbery at that time.  (*Id.* at 283.)

As such, the group drove past the leather store and went to a nearby restaurant for lunch.  (*Id.* at

283, 353, 410, 457.)  While at the restaurant, Calabrese spoke with his source on the telephone

and the source continued to discourage Calabrese from robbing the leather good store, after

which the group discussed whether to proceed with their plans.  (*Id*. at 283-84, 354, 458.)
Although Calabrese was hesitant at first, he decided that they would proceed as planned.  (*Id*. at
284, 458.)

As Calabrese had instructed, Cooper and Smith entered the store first.  (*Id*. at 287, 482.)
Once inside, Cooper displayed the gun.  (*Id*. at 282, 298, 457.)  He then forced the store's owner,
Cary Feldman, and his mother, Molly Nudell, to a back storeroom where he ordered them to the
floor and bound them with duct tape.  (*Id*. at 239, 245-47, 268-69, 459.)  Calabrese entered the
store as Cooper was directing Feldman and Nudell to the back storeroom.  (*Id*. at 290, 459-60.)
Cooper, Calabrese, and Smith then loaded dozens of leather coats into the rented van that
Calabrese had positioned outside of the store's side door.  (*Id*. at 292-93.)  Polino and Baker
remained outside in Polino's car as look-outs.  (*Id*. at 286.)  After loading the stolen leather
coats, Calabrese, Cooper, and Smith left the Leather Connection and Polino and Baker followed
in Polino's car.  (*Id*. at 414.)  Calabrese then told Cooper to take the gun, get out of the van, and
ride with Polino.  (*Id*. at 294-95, 357.)  Smith, who remained with Calabrese, counted the money
that Calabrese took from the store.  (*Id*. at 295.)  Calabrese ordered Smith from the van, but
before doing so, Calabrese told Smith that he needed some time and that he would contact them.
(*Id*. at 297.)  Cooper, Smith, Polino, and Baker then went to a bar to wait.  (*Id*. at 297, 299, 418,
462.)  When they returned to Calabrese's business, he paid Smith approximately $800 to $1,000
and gave him some leather coats.  (*Id*. at 313.)  He also gave Polino and Baker $100, as well as
some leather coats.  (*Id*. at 527-29, 542-45.)  Last, Calabrese paid Cooper $1,200 and gave him a
leather coat.  (*Id*. at 464.)

At Calabrese's criminal trial, the government presented the testimony of Molly Nudell,

3

who described the robbery, namely, how the assailants entered the Leather Connection, displayed a firearm, and directed her and her son to the back of the store where they were bound, threatened, and robbed. (*Id*. at 235-60.) The government also called Cooper, Smith, Polino, and Baker as trial witnesses, who confirmed the details of the Leather Connection robbery, including the fact that Calabrese personally directed and planned the robbery. (*Id*. at 270-301, 338-359, 400-21, 446-72.) The government presented other witnesses who testified about Calabrese's efforts to store and dispose of the leather coats, including Calabrese's former employees. (*Id*. at 527-29, 542-45.) Finally, the government introduced rental car documents through an Enterprise Rent-A-Car custodian that established that Calabrese had rented a white cargo van at the time of the robbery. (*Id*. at 505-51.)

**B.      The Metamorphous Tattoo Parlor Robbery**

The government also presented evidence at trial that Calabrese ordered and directed the armed robbery of the Metamorphous Tattoo parlor in Lockport, Illinois on July 24, 2001. In particular, in July 2001, Calabrese asked Edmund Frank to find "some guys" to shut down the new tattoo parlor. (*Id*. at 618-19.) Frank contacted Martin Flores and asked him if he had any interest in the job, to which Flores said yes. (*Id.* at 619-20.) Flores met with Frank and Calabrese at Calabrese's auto detailing store in Alsip a few days before the armed robbery. (*Id.* at 621, 783-84.) Flores asked Calabrese what he wanted done and Calabrese responded that he wanted the tattoo shop shut down. (*Id*. at 621, 699.) Calabrese also wanted the hands of the tattoo parlor's owner broken, the shop's tattoo machines stolen, and the identification cards taken of all the individuals present at the tattoo parlor during the robbery. (*Id*. at 621, 882-83, 897.) Flores recruited Juan Mirelez and Efrain Fornes to help him with the robbery. (*Id*. at 750,

4

780.)

Calabrese, Frank, and Flores met again on the day of the robbery, namely, July 24, 2001. At the meeting, they discussed the need to restrain individuals in the store during the robbery. (*Id*. at 622, 886-87.) Calabrese did not have any restraints for Flores to use, so he contacted his nephew, Daniel Calabrese, who was an Ameritech employee with access to plastic cable zip ties. (*Id*. at 622, 887.) At Calabrese's direction, Flores, together with Mirelez and Fornes, met Calabrese's nephew in a parking lot at the Chicago Ridge Mall and picked up the zip ties. (*Id*. at 624, 755, 757, 787, 792, 888-89.)

Later that day, Flores decided they needed a gun for the robbery. (*Id*. at 882.) As such, Flores contacted Frank and asked for a weapon. (*Id*. at 624-25, 793, 893.) Frank then called Calabrese and picked up a gun from Calabrese. (*Id*. at 625-26.) Calabrese instructed Frank to tell Flores that he wanted the gun back. (*Id*. at 626-27.) Frank arranged to meet Flores to give him the gun and convey Calabrese's instructions. (*Id*. at 626-27, 700, 758-59, 893.)

There were four people in the tattoo parlor when Flores, Fornes, and Mirelez arrived – the owners, Mike Farrell and Dennis Doornbos, Gabriel Perez, a customer, and Perez's girlfriend. (*Id*. at 567, 717, 761, 859, 908.) Flores entered the tattoo parlor first, brandished the gun, and ordered everyone to the floor. (*Id*. at 568-69, 571, 759-60, 795, 860-61.) Fornes and Mirelez restrained the tattoo shop victims with the zip ties provided by Calabrese's nephew, Daniel Calabrese. (*Id*. at 721, 760, 796, 861-62, 895.) After restraining the victims, Fornes and Mirelez took Farrell to the back of the shop and beat him up. (*Id*. at 721-23, 761, 863, 896.) Fornes used a hammer that he had brought with him to hit Farrell's hands. (*Id*. at 573-74, 576, 723, 761, 798.) Thereafter, the men gathered the shop's tattoo machines and their victims'

identification cards per Calabrese's instructions.  (*Id.* at 580, 726, 762, 796-97, 864, 897.)
Before leaving, Flores conveyed Calabrese's message – he told Farrell to "get out of Lockport."
(*Id*. at 577, 726.)

After leaving the tattoo shop, Flores, Fornes, and Mirelez returned to Calabrese's auto
detailing business in Alsip.  (*Id.* at 701, 763, 800, 899.)  There, Flores gave Calabrese both the
stolen tattoo machines and the victim identification cards, and returned Calabrese's gun.  (*Id.* at
706, 763-64, 900, 923.)  Calabrese told Frank, who had arrived shortly thereafter, to pay Flores
for his work after which Frank paid Flores $1,500.  (*Id.* at 630, 700, 702, 901-02, 923.)  Later
that evening, Frank paid Flores another $1,000.  (*Id*. at 630, 700.)  Calabrese reimbursed Frank
for a portion of these payments.  (*Id.* at 630, 700, 713.)

At trial, the government called Frank, Fornes, Mirelez, and Flores as witnesses.  Frank
testified that he arranged and carried out the tattoo parlor robbery at Calabrese's explicit
direction.  (*Id.* at 617-19.)  Further, Frank testified hat he contacted Flores for Calabrese and that
he arranged for Calabrese to meet with Flores before the robbery.  (*Id.* at 619, 621.)  Also, Frank
admitted that he provided Flores with Calabrese's gun and paid Flores at Calabrese's direction.
(*Id.* at 626-27, 630.)  Flores confirmed Frank's testimony stating that he met with Calabrese and
Frank in advance of the robbery and that Calabrese gave the instructions for the tattoo parlor
robbery.  (*Id.* at 882-83, 897.)  Furthermore, Flores testified that after the robbery, he delivered
the stolen tattoo machines and the firearm to Calabrese.  (*Id.* at 900.)

Mirelez and Fornes also corroborated this trial testimony.  In particular, they testified that
the group went to Calabrese's business both before and after the robbery.  (*Id.* at 753-54, 783-84,
803.)  Mirelez testified that he was present when Calabrese spoke to Flores after the robbery.

6

(*Id.* at 801-02.)  Finally, Flores, Mirelez, and Fornes testified that prior to the robbery, the men went to the Chicago Ridge Mall to obtain zip ties from Calabrese's nephew.  (*Id.* at 755, 757, 787, 792, 888-89.)  The government also called the tattoo parlor robbery victims as witnesses and they corroborated the testimony of Calabrese's co-defendants regarding details of the robbery, including the assault of Mike Farrell.  (*Id.* at 564-82, 715-27, 857-65.)

### C.    Morris' Meat Packing Robbery

Trial testimony reveals that Calabrese first learned of Morris' Meat Packing from Richard Dawson.  (*Id.* at 1023.)  Dawson's friend informed him of the business' operations and told Dawson that the store often had large amounts of cash on the premises – anywhere up to $200,000.  (*Id.* at 1022.)  Dawson told Calabrese about Morris' Meat Packing and Calabrese expressed an interest in robbing the business.  (*Id.* at 1023.)  Calabrese told Dawson to get as much information as he could about the meat packing store and to arrange a meeting between himself and Dawson's source.  (*Id.* at 1023-24.)  After this meeting, Calabrese began making plans to rob the store.  (*Id.* at 1024.)

Calabrese recruited Frank and Dawson recruited Dave Sims to commit the robbery.  (*Id.* at 631-32, 940, 1025.)  Calabrese, Dawson, Frank, and Sims met at Sims' house on the morning of the robbery.  (*Id.* at 633, 941, 1024.)  While Dawson contacted his source to get last minute information about the business, Calabrese sat at Sims' kitchen table, loaded his gun, and discussed the robbery with Sims.  (*Id.* at 634, 941, 974, 1026-27.)  Sims asked if he should bring his gun, and Calabrese or Dawson indicated that he should.  (*Id.* at 634, 942.)

The group left Sims' house in two vehicles and drove to a location in Maywood, Illinois leaving Sims' truck there.  (*Id.* at 636-37, 942, 1027.)  They then proceeded to the meat packing

7

business in one vehicle. (*Id*. at 943, 1028.) During the drive, Calabrese told Frank and Dawson that they were going into the meat packing store. (*Id*. at 640.) Although Frank agreed, Dawson refused. (*Id*. at 942, 1028-29.) When they arrived at the store, Calabrese, Sims, and Frank proceeded inside, while Dawson stayed in the car as the get-away driver. (*Id*. at 943, 1029.)

Calabrese and Sims entered Morris' Meat Packing with firearms and headed straight to a back office. (*Id*. at 641, 943-44.) Frank Masellis, one of the store's owners, was sitting in the office speaking with Irma Powell, the mother of Anthony Keefer, one of the shop's butchers. (*Id.* at 1002, 1070.) Calabrese immediately brandished his weapon and demanded money from Masellis. (*Id*. at 944, 1074.) Masellis gave Calabrese approximately $1,500 from an office filing cabinet. (*Id.* at 945, 1075.) Then, Calabrese directed Masellis to a second office where Masellis provided Calabrese with approximately $14,000 and a gun. (*Id*. at 945, 1079.) Before leaving, Calabrese asked for Masellis' driver's license and told Masellis that if he "didn't keep [his] mouth shut," Calabrese would kill his children. (*Id*. at 644, 1080-81.)

Calabrese, Sims, and Frank left the store and returned to the get-away car. (*Id*. at 642, 947, 1029.) During the drive back to pick up Sims' truck, Calabrese told Sims, Frank, and Dawson that the store did not have as much money as he thought. (*Id*. at 641-42, 947, 1030.) When the group went back to Calabrese's auto detailing business, Calabrese paid Dawson and Sims $1,000 each for their participation and Frank $1,300 for his assistance. (*Id.* at 645, 948, 1031-32.)

At trial, the government presented testimony of the robbery victims and Calabrese's co-defendants, Frank, Sims, and Dawson – all of whom admitted their roles in the robbery and testified that Calabrese organized, oversaw, and directly participated in the robbery. (*Id.* at 631-

45, 938-51, 1018-38.)  The government also presented the testimony of Frank Masellis, Irma

Powell, and Anthony Keefer.  (*Id*. at 982-95, 1000-08, 1062-89.)  Powell described the robbery,

identifying the perpetrators by size and shape.  (*Id*. at 991-92.)  Likewise, Keefer and Masellis

provided descriptions of the two individuals who entered the office, namely, Calabrese and Sims.

(*Id*. at 990, 1004-05.)  Keefer also testified that in 2006 he had identified Calabrese in a photo

array as one of the two individuals who had entered the back office on the date of the robbery.

(*Id*. at 1006-07.)  Last, Masellis identified Calabrese in court as the individual who robbed

Morris's Meat Packing and described how Calabrese had threatened to kill his family if he

assisted law enforcement.  (*Id*. at 231, 1071-72.)

### D.    Frank Audio Recording

On January 31, 2002 – after the dates of the charged conduct in the second superseding

indictment – Edmund Frank was cooperating with the government.  In connection with his

cooperation, Frank agreed to wear a recording device to record a meeting that afternoon with

Cooper – who was not yet cooperating with the government – and Calabrese.  The meeting took

place at Calabrese's business.  As part of its case-in-chief, the government introduced and

published to the jury the January 31, 2002 audio recording of the meeting between Calabrese,

Cooper, and Frank.  (*Id*. at 652-59.)

At the beginning of the meeting, Calabrese told Frank:  "[T]hree weeks and she didn't

know where you were.  What about that?  First of all, lift your shirt up."  (*Id*. at 653.)  Frank and

Cooper testified at trial that Calabrese was attempting to determine if Frank was wearing a wire.

(*Id.* at 470-71, 653.)  Thereafter, Frank proceeded to tell Calabrese that he was in jail in Lake

County, Indiana in response to Calabrese's questioning of Frank's whereabouts.  (*Id*. at 654.)

Calabrese then asked various questions about how Frank was able to get out of jail.  (*Id.*)  During their meeting, Calabrese warned Frank: "[A]ny little stupid shit, you know, that goes on around here, you know to keep your mouth shut.  I mean you understand what'll happen?"  (*Id.* at 677, R. 172-2, at 11.)  At trial, Frank testified that he understood Calabrese to be threatening him not to cooperate with law enforcement, an understanding that Cooper confirmed at trial.  (*Id.* at 468-71, 656, 658.)  Calabrese and Cooper then interrogated Frank and began beating and stomping on him when Frank did not sufficiently answer one of their questions.  (*Id.* at 471-72, 657.)  Afterwards, Calabrese and Cooper searched Frank for a recording device by forcing Frank to strip naked.  (*Id.* at 658, 674.)  Calabrese then stated to Frank: "[L]et me tell you something. Anything fuckin' happens, anything happens to me, anything around here, we'll fuckin' kill you."  (*Id.* at 658-59; R. 172-2, at 13.)

## II.    Jury's Verdict, Sentence, and Appeal

On February 8, 2008, a jury returned a guilty verdict convicting Calabrese of all the charges against him.  On July 18, 2008, the Court sentenced Calabrese to 751 months' incarceration.  Calabrese appealed his convictions and sentence.  The Court of Appeals for the Seventh Circuit affirmed the convictions and sentence on July 14, 2009.  *See United States v. Calabrese*, 575 F.3d 362 (7th Cir. 2009).  On March 22, 2010, the United States Supreme Court denied Calabrese's petition for a writ of certiorari.  On March 15, 2011, Calabrese filed the present motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.

## LEGAL STANDARD

"[R]elief under § 2255 is an extraordinary remedy because it asks the district court essentially to reopen the criminal process to a person who already has had an opportunity for full

process." *Almonacid v. United States,* 476 F.3d 518, 521 (7th Cir. 2007). Under Section 2255, relief "is available only when the 'sentence was imposed in violation of the Constitution or laws of the United States,' the court lacked jurisdiction, the sentence was greater than the maximum authorized by law, or it is otherwise subject to collateral attack.*" Torzala v. United States*, 545 F.3d 517, 521 (7th Cir. 2008) (quoting 28 U.S.C. § 2255). A Section 2255 motion is not a substitute for a direct criminal appeal nor is it a means by which a defendant may appeal the same claims a second time. *See Varela v. United States,* 481 F.3d 932, 935 (7th Cir. 2007) (Section 2255 motion is "neither a recapitulation of nor a substitute for a direct appeal.") (citation omitted). As such, if a Section 2255 petitioner does not raise a claim on direct appeal, that claim is barred from the Court's collateral review unless the petitioner can demonstrate cause for the procedural default and actual prejudice from the failure to appeal. *See Sandoval v. United States*, 574 F.3d 847, 850-51 (7th Cir. 2009); *Torzala,* 545 F.3d at 522. Because claims of ineffective assistance of counsel usually involve evidence outside of the trial record, such claims may be brought for the first time in a Section 2255 motion. *See Massaro v. United States,* 538 U.S. 500, 504, 123 S.Ct. 1690, 155 L.Ed.2d 714 (2003).

## ANALYSIS

Construing Calabrese's pro se Section 2255 motion liberally, *McGee v. Bartow,* 593 F.3d 556, 566-67 (7th Cir. 2010), and consolidating his repetitive claims, Calabrese brings the following ineffective assistance of counsel claims: (1) trial counsel failed to adequately advise him of the risks of litigation and his sentencing exposure, which, had he known, he would have pleaded guilty; (2) trial counsel failed to adequately investigate, research, and prepare the case for trial; (3) trial counsel failed to object and preserve for appeal the deprivation of his right to

11

confront witnesses; (4) trial counsel failed to move to dismiss as untimely the charges of which

he was convicted; (5) appellate counsel was constitutionally ineffective for failing to brief and

argue on appeal the issue that the government used impermissibly leading questions at trial; and

(6) appellate counsel was ineffective for failing to brief and argue other meritorious issues.

## I.     Ineffective Assistance of Trial Counsel

First, Calabrese argues that his trial counsel failed to provide effective assistance of

counsel under the Sixth Amendment.  To establish constitutionally ineffective assistance of

counsel, Calabrese must establish that (1) his attorney's performance "fell below an objective

standard of reasonableness," and (2) "but for counsel's unprofessional errors the result of the

proceeding would have been different."  *Strickland v. Washington,* 466 U.S. 668, 688, 694, 104

S.Ct. 2052, 80 L.Ed.2d 674 (1984).  The Court's "review of the attorney's performance is

'highly deferential' and reflects 'a strong presumption that counsel's conduct falls within the

wide range of reasonable professional assistance; that is, the defendant must overcome the

presumption that, under the circumstances, the challenged action might be considered sound trial

strategy.'"  *Koons v. United States,* 639 F.3d 348, 351 (7th Cir. 2011) (citation omitted).

Meanwhile, if Calabrese fails to make a proper showing under one of the *Strickland* prongs, the

Court need not consider the other.  *See id.* at 697 ("In particular, a court need not determine

whether counsel's performance was deficient before examining the prejudice suffered by the

defendant").

### A.     Litigation Risks and Sentencing Exposure

In the present motion, Calabrese maintains that had his trial counsel informed him of the

overwhelming amount of evidence against him and his sentencing exposure, he would have

instructed his attorney to seek a plea agreement. As the Seventh Circuit teaches: "When assessing counsel's performance, we have noted that a reasonably competent lawyer will attempt to learn all of the relevant facts of the case, make an estimate of a likely sentence, and communicate the results of that analysis to the client before allowing the client to plead guilty." *Bethel v. United States,* 458 F.3d 711, 717 (7th Cir. 2006); *see also Almonacid,* 476 F.3d at 521 ("When counsel advises the defendant to reject a plea offer, his performance is not objectively unreasonable unless such advice is made 'in the face of overwhelming evidence of guilt and an absence of viable defenses.'") (citation omitted).

Here, the government submits the affidavit of Calabrese's trial counsel, Steven R. Hunter, in which he avers that at various points prior to trial, he turned over discovery materials to Calabrese, visited Calabrese at the Metropolitan Correctional Center on at least five occasions, and talked to him on the telephone about his case and informed Calabrese that his co-defendants had all pleaded guilty. (R. 9-1, Hunter Aff. ¶ 4.) In addition, Hunter avers that he discussed the government's proposed witnesses, possible defenses, and Calabrese's sentencing exposure with Calabrese. (*Id.* ¶¶ 5, 6. ) Hunter further stated that he met with the Assistant United States Attorney ("AUSA"), who was prosecuting the case, to discuss a potential plea agreement, but that the AUSA informed him that absent Calabrese's cooperation, the government would not consent to a plea agreement allowing Calabrese to plead guilty to reduced charges. (*Id.* ¶ 7.) Calabrese, on the other hand, avers that Hunter never fully apprised him of the evidence against him nor his sentencing exposure. (R. 3, Calabrese Aff. ¶ 2.)

Even if trial counsel did not fully apprise Calabrese of the evidence against him, the Court would be hard-pressed to conclude that Calabrese was not aware of the overwhelming

amount of evidence against him, which consisted not only of his co-defendants' testimony, but his victims' testimony as well. Except for the Metamorphous Tattoo parlor armed robbery, Calabrese himself was at the stores when he and his co-defendants executed his plans. Calabrese was certainly aware of the victims of his crimes, including Molly Nudell, who was in the back storeroom of the Leather Connection when Cooper bound her and Cary Feldman with duct tape and threatened them. Further, Calabrese was aware of the victims of the Morris Meat Packing armed robbery, all of whom later testified at trial. In fact, Calabrese threatened owner Frank Masellis stating that if Masellis did not keep his mouth shut, Calabrese would kill his children. Moreover, it would have taken nothing less than wilful ignorance for Calabrese not to know that his co-defendants had all pleaded guilty during the course of his case and would be testifying as government witnesses, especially because Calabrese and his co-defendants were all indicted together and the government provided a witness list prior to trial that included Calabrese's co-defendants. Further, the parties discussed the cooperating witnesses' potential testimony at length at the pre-trial conference, especially in the context of the government's *Santiago* proffer, and the government turned over the plea agreements of the cooperating defendants to the defense.

Next, despite Calabrese's present argument that he would have pleaded guilty had his trial counsel properly informed him of the evidence against him and his sentencing exposure, prior to his indictment, the government sought Calabrese's cooperation and warned him of the potential penalties that he would face if he refused. Specifically, at his sentencing hearing, Calabrese stated the following on the record:

> Six years ago, when I was incarcerated on this case, in this building I was taken into a room. In that room, they had my life on a blackboard. And I was

14

told they wanted me to cooperate not with nothing to do with the case I'm on now, not even nothing to do with the three cases that I'm convicted of, but for stuff that I had nothing to do with, for people that I don't even know. But that I was told, "You're gonna go to jail for this. And when you get out, you're gonna go for this. And if you get out of that, you're gonna go – you're gonna die in jail," is what they told me.

(R. 315, Sent. Tr. at 82.)

Thus, prior to his indictment, Calabrese was aware that he was facing a significant amount of prison time if convicted. Yet, in the present Section 2255 motion, Calabrese takes issue with the fact that his attorney did not procure a plea agreement in which Calabrese did not have to cooperate in other criminal investigations. Counsel's failure to procure any such agreement does not amount to constitutionally ineffective assistance of counsel. *See Koons,* 639 F.3d at 351. As the Seventh Circuit explains in assessing the *Strickland* performance prong, the "question is whether an attorney's representation amounted to incompetence under prevailing professional norms." *Koons,* 639 F.3d at 351. Under the circumstances, Calabrese's trial counsel was not incompetent under prevailing professional norms because obtaining a plea agreement without Calabrese's cooperation was highly unlikely as evidenced by Calabrese's comments at sentencing. As such, Calabrese has not overcome the strong presumption that his attorney's representation was within the wide range of reasonable professional assistance when he did not procure a plea deal that excluded any cooperation on Calabrese's part. *See Harrington v. Richter*, ___ U.S. ___, 131 S.Ct. 770, 787, 178 L.Ed.2d 624 (2011) ("The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'") (quoting *Strickland*, 466 U.S. at 687).

In fact, Calabrese admits in his affidavit that he filed in support of his Section 2255

15

motion that "it was my understanding (based on counsel's indication) that no offer was ever made or would be made because the U.S. Attorney wanted to take my case to trial and give me maximum prison time unless I told law enforcement about open homicide cases." (Calabrese Aff. ¶ 6.) Given that Calabrese admits that the United States Attorney's Office would never make him a plea offer unless he cooperated, Calabrese cannot establish that he was prejudiced by counsel's inability to procure a plea agreement without his cooperation because it was an impossibility. *See United States v. Jones,* 635 F.3d 909, 916 (7th Cir. 2011) (petitioner "must show that there is a reasonable probability that but for his counsel's mistakes, the result of the proceedings below would have been different"). Because Calabrese fails to establish both performance and prejudice prongs under the *Strickland* standard, this claim is without merit.

### B. Investigate, Research, and Prepare for Trial

Next, Calabrese argues that his trial counsel failed to adequately investigate his case, research legal issues, interview witnesses, and prepare for trial. Calabrese, however, does not give sufficient details or explanations concerning his argument. *See Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) ("undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (citation omitted); *Porco v. Trustees of Ind. Univ.,* 453 F.3d 390, 395 (7th Cir. 2006) (pro se litigant's inadequately developed arguments waived).

Nevertheless, the Court is familiar with Calabrese's counsel and their work on Calabrese's case having presiding over these proceedings since Calabrese's and his co-defendants' arraignments in May 2006. The Court observed Calabrese's trial counsel during the proceedings and has sufficient information based on counsel's performance and the record that Calabrese's attorneys, especially Steven Hunter, provided outstanding counsel to Calabrese

16

during his criminal proceedings. To clarify, assessing counsel's representation as a whole, counsel provided a vigorous defense by filing numerous in limine motions, defending against the government's motions in limine, conducting thorough cross-examinations at trial, writing a detailed sentencing memorandum, and presenting witnesses at Calabrese's sentencing hearing. *See Brown v. Finnan,* 598 F.3d 416, 422 (7th Cir. 2010) (courts "assess counsel's work as a whole, and 'it is the overall deficient performance, rather than a specific failing, that constitutes the ground of relief.'") (citation omitted). In addition, counsel's representation of Calabrese at sentencing revealed his deep understanding of Calabrese's background and family life. His representation before and during trial established his grasp and thorough understanding of the facts underlying Calabrese's charges and the controlling legal authority. As such, counsel's performance was not deficient under the performance prong of the *Strickland* standard as Calabrese claims. *See George v. Smith,* 586 F.3d 479, 485-86 (7th Cir. 2009) ("If a defendant is unable to *make a sufficient showing* on either component of the *Strickland* standard, we need not consider the other component." ) (emphasis in original). Therefore, this ineffective assistance of trial counsel claim is without merit.

### C.    Right to Confront Witnesses

Calabrese's right to confront witnesses argument is based on David Sims' trial testimony that was done by video teleconferencing. More specifically, at trial, the government called Sims – who participated in the Morris' Meat Packing robbery with Calabrese – as a witness. Sims resided in Arizona at that time and was unable to travel to Chicago to testify due to the weather. At that time, the government had presented the majority of its case-in-chief, and therefore, requested that Sims be allowed to testify via teleconferencing to avoid any delay. Indeed, based

17

on the trial record, after the government proposed the video teleconference option, the Court instructed defense counsel to talk to Calabrese about the option. (Tr. at 742-43.) Also, the parties discussed the option with the Court in Calabrese's presence later that day. (*Id*. at 824-25.) After speaking with Calabrese in the courtroom, defense counsel informed the Court that on behalf of Calabrese, there was no objection to the video teleconferencing. (*Id*. at 825.) Calabrese avers otherwise. (Calabrese Aff. ¶ 11.)

Assuming counsel's performance was deficient under *Strickland* as Calabrese argues (which it was not), Calabrese cannot establish that he was prejudiced by counsel's conduct based on the overwhelming amount of evidence establishing that Calabrese was guilty of the Morris' Meat Packing robbery. More specifically, at trial, the government presented testimony of the robbery victims and Calabrese's other co-defendants, Ed Frank and Richard Dawson, who admitted to their roles in the robbery and testified that Calabrese organized, oversaw, and directly participated in the robbery. The government also presented the testimony of Irma Powell, who described the robbery and identified the perpetrators. Similarly, Anthony Keefer and Frank Masellis provided descriptions of the two individuals who entered the office, including Calabrese. Keefer also confirmed that in 2006 he had identified Calabrese in a photo array as one of the two individuals who had entered the back office on the date of the robbery and Masellis identified Calabrese in open court as the individual who robbed Morris' Meat Packing and described how Calabrese threatened to kill his family if he assisted law enforcement.

Moreover, Calabrese has not identified how the video teleconferencing of Sims' testimony prejudiced him. Indeed, Sims appeared live via teleconferencing and Calabrese's

18

counsel thoroughly cross-examined Sims. *See Yu Tian Li v. United States,* 648 F.3d 524 (7th

Cir. 2011) (use of videotaped testimony did not violate right to confront witness if defendant had

opportunity for cross-examination); *United States v. McGowan,* 590 F.3d 446, 456 (7th Cir.

2009) (no confrontation clause violation when witness fully cross-examined).

Based on the overwhelming amount of evidence of Calabrese's guilt, along with

counsel's opportunity to cross-examine Sims, Calabrese has not established that counsel's failure

to object to the teleconferencing of Sims' testimony prejudiced him. *See Brown*, 598 F.3d at 424

(fact that evidence of defendant's guilt was overwhelming militates against a finding that

introduction of disputed evidence affected jury's verdict). As such, Calabrese's ineffective

assistance of counsel claim based on the confrontation clause claim fails. *See United States v.*

*Taylor,* 569 F.3d 742, 748 (7th Cir. 2009) ("Courts may deny ineffective assistance of counsel

claims for lack of prejudice without ever considering the question of counsel's actual

performance.").

> **D.** **Motion to Dismiss Charges as Untimely**

Calabrese also maintains that his trial counsel was constitutionally ineffective for failing

to file a motion to dismiss the indictment. Calabrese specifically argues that counsel's failure to

challenge the government's unreasonable delay in bringing the robbery charges against him

caused specific, concrete, and substantial prejudice to his ability to defend against the charges.

Although the charges against Calabrese were not statutorily time-barred, he argues that his Fifth

Amendment right to due process was violated because of the delay. *See United States v. Spears,*

159 F.3d 1081, 1084 (7th Cir. 1998). As the *Spears* decision instructs for "a defendant to

successfully assert a due process violation based on an unjustified pre-indictment delay, he must

19

first show that the delay caused actual and substantial prejudice to his right to a fair trial. In order to prove actual and substantial prejudice, the defendant must show more than mere speculative harm." *Id.* (internal citations omitted). A defendant must also show that the government's delay was an intentional device to gain tactical advantage over him. *See id.*; *see also United States v. Wallace*, 326 F.3d 881, 886 (7th Cir. 2003).

Trial counsel's performance was not deficient under the first *Strickland* prong for his failure to bring a motion to dismiss the indictment based on Calabrese's due process rights because there is no evidence in the record that the government intentionally delayed the indictment to gain a tactical advantage over Calabrese. *See Wallace,* 326 F.3d at 886. In other words, because any such claim has no factual basis, defense counsel's decision not to move to dismiss the indictment was sound trial strategy. *See United States v. Recendiz*, 557 F.3d 511, 531 (7th Cir. 2009) (it is not court's "role to second-guess counsel's strategic decisions or "take up the role of the 'Monday morning quarterback.'") (citation omitted). Therefore, Calabrese has failed to overcome the presumption that, under the circumstances, his counsel's performance was constitutionally reasonable. *See Koons,* 639 F.3d at 351. Accordingly, this ineffective assistance of counsel claim is without merit. *See Taylor,* 569 F.3d at 748 (*Strickland's* two-part test requires *both* deficient performance *and* prejudice") (emphasis in original).

## II.     Ineffective Assistance of Appellate Counsel

Calabrese further argues that his appellate counsel provided constitutionally ineffective assistance of counsel. As with ineffective assistance of trial counsel claims, courts apply the two-prong test set forth in *Strickland* to evaluate the effectiveness of appellate counsel. *See Suggs v. United States,* 513 F.3d 675, 678 (7th Cir. 2008). Under the *Strickland* performance

prong, an appellate counsel's performance is constitutionally deficient if counsel fails to appeal an issue that is obvious and clearly stronger than the claims counsel raised on appeal. *See id.*; *see also Johnson v. Thurmer,* 624 F.3d 786, 793 (7th Cir. 2010). To establish the *Strickland* prejudice prong, Calabrese must show that "there is a reasonable probability that the issue his appellate attorney failed to raise would have altered the outcome of the appeal, had it been raised." *Brown,* 598 F.3d at 425; *see also Suggs,* 513 F.3d at 678.

### A.    Impermissible Leading Questions

Calabrese first argues that his appellate counsel was constitutionally ineffective for failing to argue on appeal that the government asked impermissibly leading questions. Calabrese's counsel, however, presented this argument in both the opening and reply briefs on appeal. (*See* 08-2861, R. 24, Opening Brief, at 15, 22-23, 40; R. 37, Reply Brief, at 5.) As such, Calabrese's claim lacks any factual foundation, and thus is without merit.

### B.    Other Meritorious Issues

Last, Calabrese's argument that his appellate counsel was ineffective for failing to brief and argue other meritorious issues is too vague and speculative for any meaningful consideration. *See Porco,* 453 F.3d at 395 (pro se litigant's inadequately developed arguments); *see also United States v. Hodges,* 259 F.3d 655, 660 (7th Cir. 2001) ("An effective assistance of counsel claim cannot stand on a blank record, peppered with the defendant's own unsupported allegations of misconduct"). Because Calabrese has failed to develop these arguments, this ineffective assistance of appellate counsel claim is without merit.

On a final note, the Court denies Calabrese's request for an evidentiary hearing because district courts "need not hold an evidentiary hearing where the motion, files, and records of the

case conclusively show that the prisoner is entitled to no relief." *Hutchings v. United States,* 618 F.3d 693, 699 (7th Cir. 2010); 28 U.S.C. § 2255(b). As discussed in detail above, the record in this matter conclusively establishes that Calabrese is not entitled to relief under Section 2255.

## III. Certificate of Appealability

Under the 2009 Amendments to Rule 11(a) of the Rules Governing Section 2255 Proceedings, the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Accordingly, the Court must determine whether to grant Calabrese a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2) in this order.

Under 28 U.S.C. § 2253(c)(2), a petitioner does not have an absolute right to appeal a district court's denial of a Section 2255 motion; instead, he must first request a certificate of appealability ("COA"). *See Miller-El v. Cockrell,* 537 U.S. 322, 335-36, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003); *see also* 28 U.S.C. § 2253(b). Calabrese is entitled to a COA only if he can make a substantial showing of the denial of a constitutional right. *See Miller-El,* 537 U.S. at 336; *Sandoval v. United States*, 574 F.3d 847, 852 (7th Cir. 2009). Under this standard, Calabrese must demonstrate that reasonable jurists would find the Court's assessment of his Section 2255 claims debatable or wrong. *See Miller-El,* 537 U.S. at 336; *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000).

Here, the Court can find no reason why reasonable jurists would debate or disagree with the Court's ruling that Calabrese failed to establish his ineffective assistance of counsel claims under the *Strickland* standard. Therefore, the Court declines to certify any issues for appeal pursuant to 28 U.S.C. § 2253(c)(2).

22

## CONCLUSION

For these reasons, the Court denies Petitioner's motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. Further, the Court declines to certify any issues for appeal pursuant to 28 U.S.C. § 2253(c)(2).

**Dated:** September 16, 2011

ENTERED

_____
**AMY J. ST. EVE**
**United States District Court Judge**

23